Martinez v. New York Good afternoon, Your Honors. Andrew Buxbaum here on behalf of Appellant Charles Martinez. May it please the Court. This case presents an interesting geometry problem. How to allow a marine oiler to safely exit from a confined space via a vertical ladder with hydraulic oil on the bottom of his work boots. We believe the Court below did not perceive the nature of the dangerous condition presented here and we urge the Court to reverse. And essentially we have five arguments as to how the Court below erred. First, the Court said that there was no proof where Martinez was on the ladder. And that's belied by the record at appendix in numerous places. Martinez definitely testified that he was between the fourth and fifth rung on this ladder. And that's heading up, counting from the bottom? Counting from the bottom, Your Honor. That's at appendix page 48 and appendix page 46. He testified that his left foot was on the fourth rung from the bottom and his right foot was on the fifth rung from the bottom. May I ask you before your client gets on the ladder, the dangerous condition that you start with is the oil on the floor beneath him, right? That's correct. These were leaking steering pistons in this confined space. Your client, as I understand it, was in that area with the oil in order to clean it up. Correct, Your Honor. That was his job. So what is the hazardous condition vis-a-vis your client when he is on that floor in order to clean it up? He's there to remedy the dangerous condition. Help me out. I agree with you there, Your Honor. This was a known condition and I don't think that's the main point we're making. The oil on the deck was a dangerous condition. Can you set that aside and just focus on the ladder? Well, we can set that aside with the proviso that it coated his boots and there's no way to get it off his boots while he's down there. So he's- Well, they had cleaning supplies down there. The first thing you have to do to clean these boots is to take them off and to use a degreaser. And there's nowhere to sit down there or untie your boots. If you look in the record, this is- I just assumed you could use the supplies to clean them down there because there's no challenge here that the hazardous condition is not being able to clean your boots before you leave the area. That's correct, but I think it contributes to the danger, the lack of the handholds, because his boots are coated while he's going up the ladder. We can certainly put aside the oil as the dangerous condition. You're not challenging that as a separate and distinct hazardous condition? Correct, Your Honor. Just to make sure I understand, you're not saying there was excessive oil on the floor that he was supposed to be cleaning up and that would be part of the lack of seaworthiness? No. We're certainly arguing that. Let me retract that statement, Your Honor. We believe that this longstanding condition constitutes an unseaworthy condition because- You're saying there was excessive oil on the floor. He complained about that. That made the vessel unseaworthy. Is that right? That's another ground for our unseaworthiness argument. Then we have to come back to the first question I asked you. The ship apparently understands this because it has given the task to certain people to clean that. I'm trying to understand what is unseaworthy when a condition that's inevitable, the release of oil on a ship, the ship provides for the cleaning of it, your client is the person who's supposed to clean it. What's unseaworthy? There's an excessive amount of oil on that deck. Instead of fixing the steering pistons to allow- That's a question. Is it inevitable or was there something, was there excessive leaking because something wasn't maintained properly? Does the record indicate? The ship is 50 years old. There's nothing in the record. We didn't inspect the steering pistons, but the ship is 50 years old. It would be one thing if there is always oil and that's ordinary, you expect it because by the nature of these machines, they spit off oil. That would be one scenario. Another scenario would be the machines weren't being well maintained. They were leaking when they shouldn't have been leaking and that was creating a hazardous condition. Do we know from the record? We don't know, Your Honor. There's nothing in the record to indicate that these machines were leaking excessively. What we do know is that there was enough oil on the deck that there were buckets to pick up that oil to reuse the oil. I think the inference can be drawn that they were leaking an excessive amount of oil onto that deck. Well, it wouldn't be if the buckets were enough to capture it. It's a little unclear what exactly you're saying is the hazardous condition. If I can move on, the real hazardous condition is the lack of the handholds while he's going up. You need to visualize what this hatch looks like. I'd like to actually ask you about that because I was confused in the record about the hatch. If you look at page A94 and A95 of the record, the hatch cover in figure one that your expert depicts as A94 and A95, this is the Fisher Maritime report, figure one says hatch cover on entrance to steering compartment and describes that as the entry to the hatch, right? Correct. And then if you look at figure two, it says a view of the hatch with the cover in the open position is shown in figure two. But figure two has this orange vent at the foot of it and figure one does not. It looks to me like those are different hatches. It seemed the same to me, Your Honor, and I have no explanation for that. It seems to me that figure one is not the same hatch as figure two. How can we tell which is the one to look at and where the handholds are or not? It's figure two. I noticed the same thing. This is your expert's report. Your Honor, I have no explanation for that, but figure two is the correct figure. How do you know that? Because we were on board the vessel and both experts relied on figure two. Mr. Dean as well as... Figure two suggests that you could hold on to the vent as well as the open hatch cover and the combing. You can't, Your Honor. Why is that? Because the ladder in figure two is on the left side of the hatch as you're looking at figure two. And it's going straight up and it's adjacent to the open hatch cover. Okay? If you look at the diagram... Where in the record does it say that the ladder is on the left side of the hatch? Because I'm looking now at figure three and to the extent that it's a rectangle, the ladder seems to be coming up the narrow sides of the rectangle, which would be where the hatch cover is on this, not where the hatch cover is along the left side of it. If you look at figure four, you're correct, Your Honor. The ladder is adjacent to the hatch cover. Okay? Figure four sets it out, the general schematic of how this hatch... Why can't you, as Judge Carney just asked, hold on to both the cover and the... The combing? Yeah. Okay. Let's talk about the cover. The hatch... Both things. That's what you were asked, is why you couldn't hold on to both. The hatch is 15 inches wide. As you're going up this ladder, you cannot get through the 15 inch diameter facing the hatch cover. In the record, Mr. Martinez's shoulder width is 22 inches. So as he's going up the ladder, if the hatch were wide enough, he could conceivably reach the hatch cover. But because the hatch is 15 inches wide, he needs to turn to get up to use the 30 inch length of the hatch in order to get up. So is it the size of the hatch that's deficient? Well, I don't want to say the size of the hatch is deficient, because that's the way the ship was built. The deficiency is that as he's facing away or perpendicular from the hatch cover, there is nothing to grab onto to prevent him from falling. But isn't he facing the hatch cover as he comes up the ladder? Initially, no. He's not at all. He's going down sideways, you're saying. Yeah. He can't fit through the... He's going down sideways and the hatch cover is on his left. But the ladder is also on his left, so it does sound awkward, because he has to twist his body somehow. He's got to twist. He's 5'11", 240 pounds, all of this is in the record. He cannot possibly fit through the 15 inch hatch opening to reach the hatch cover. He could hold it on the side as he's going down. Well, it's kind of awkward, because he's got rungs going one way and he's facing another way on very narrow rungs, and he can't get out that way. He cannot get out the way the hatch cover is open. So there's another... Let me interrupt for just a second. On A125, there's Mr. Dine's report and another sketch, and you would say that is misleading, because it suggests that he could go up directly as Judge Rafferty... He cannot fit through that opening that way. It's only 15 inches wide. I mean, this is a yardstick. I weigh 148 pounds. He weighed 200... I mean, this is a foot long. He weighed 240 pounds. There is no way he's going to fit through a 15 inch opening facing in that direction. Okay? Now, as far as the combing... How many years had he worked on this ship? I believe nine years. And that's what he had been doing for the nine years, right? That was one of his jobs, yes. No, no, but he had been coming up and down and through this hatch in exactly this condition for nine years. I would imagine so, Your Honor. Yes. Did he ever ask for handholds? I'm sorry, did he ever... I get it. Nothing in the record that he asked for handholds, but this is a dangerous situation here, especially given the size of this hatch and the fact that you cannot get out on the side where the hatch cover is. So for a negligence claim, you need notice? Well, no... On seaworthiness, you don't, but for negligence, you need... They knew or should have known of the problem, and this is so patently obvious that it should have been corrected. Even Mr. Dean, when he was going up the side... You would say they had constructive notice just because of the size of the hatch, regardless of the absence of accidents over the course of the vessels, right? Absolutely. This is so patently obvious that even Mr. Dean, the defendant's expert, in his report said he had to twist while he was going up the hatch. Why wouldn't the combing and the side of the hatch cover be sufficient to hold on to? It seems like that had worked for a long time. Well, first of all, combing is not a handhold. If you look at the combing... Well, not to say it's ideal, but that's what is available. In the position that Mr. Martinez was when he slipped, he could not reach the combing, and our expert, Dr. Fisher, has gone through this. I'm sorry, he couldn't reach it? I thought half of his body's above the... Which is 20 inches. And the height above the combing that Dr. Fisher has extrapolated, Mr. Martinez would not be in a position to reach the combing. To use... He's too far above it. He's too far above it. The combing is too far below it. And just visualize, if you're holding something below as you start to fall, it's not an effective means of stopping the fall. It should be something above you, on the side, as you're facing the side, to allow you to stabilize yourself and prevent a fall. What did he hold onto on all the other occasions he came through the hatch? I'm assuming he did his best, Your Honor. I mean, I honestly don't know how anyone would really get down into this hatch safely when you're coming at it from the side with the hatch cover open. I understand your argument, and in the abstract it's persuasive until we add in the fact that the man somehow did it for nine years without effect. Your Honor, I'll cite to Judge Hand in the T.J. Hooper, merely because something has been done for years doesn't necessarily make it correct. On seaworthiness I understand, but I'm trying to again understand how anyone had noticed that this was insufficient when it was designed to specifications at the time and your client both successfully used it and didn't complain about it. Your Honor, there's nothing in the record about complaints. You're correct about that. Or anyone else's complaints, right? There's nothing in the record about that. Or anyone else's accidents. There's nothing in the record about other accidents, but that does not make it safe. And as I've tried to demonstrate- Well again, seaworthiness or negligence. I mean, you're saying that you have the notice obligation on negligence. Well new or, as Judge Carney said, constructive notice. All right, let's hear from the other side, and then I know you're going to reserve some time. Thank you, Your Honors. Good afternoon. Susan Paulson on behalf of the city. Your Honors, the plaintiff cannot establish that there was a dangerous or defective condition that caused his injury from either the ladder or from the leaking pistons in the steering cabinet. Let's start where he started with the leaking pistons. He says that there was an excessive amount that he complained about it on a number of occasions. So why don't we have at least a colorable claim of unseaworthiness? We don't have a colorable claim of unseaworthiness here, because he fails to describe a condition of unreasonable slipperiness, as this court's cases have held. Mr. Martinez, from his own testimony, entered the steering compartment and performed all of his job duties, emptying the pail that collected the oil, cleaning up the steering cabinet deck, and then prepared to exit and partway up the ladder he then slipped. So- The plaintiff then explained these devices that you had to capture oil were not sufficient. They overflowed and therefore created the hazardous condition of the oil on the deck. But the oil on the deck was not unreasonably slippery so that he could not perform the duties that he was charged with performing in the steering cabab. Why is there a question of fact as to whether it was unreasonably slippery? Because there was no evidence that this steering compartment deck was unreasonably slippery because he successfully performed all of his- Photographs, there are photographs of lots of oil, there- Well, there actually are no photographs of lots of oil. The photographs actually- I'm trying to ask a question. Yes. He slipped, he testified that there was oil on his boots because he picked up excess oil from the floor. Why couldn't that support a jury verdict in his favor? Your Honor, by his own testimony, he knew of the oil condition, right? He was charged with cleaning it. He said he was wearing oil resistant boots. He entered the steering compartment. He completed all of his tasks that he was charged with doing there. As Judge Raggi pointed out previously, he could have cleaned his boots with the existing cleaning supplies. There was no testimony or evidence that it would have been difficult or impossible to do so. He apparently neglected to do so or neglected to sufficiently do so. And upon exiting, due to remaining oil on his boots, he slipped on the ladder. The photographs do not show pails and cofferdams spilling over. They show them containing the leaking oil and grease. They show that the containment measures were in the steering cabinet. Yes, and there were oil absorbent pads and cofferdams to absorb the leaking grease. And this routine accumulation of oil or grease is to be expected. Under our unseaworthiness claim, it's a relative concept. Is there evidence in the record that this was a routine amount of oil? I mean, this was the question I was asking earlier, or was this excessive leaking? Yes, there's no evidence in the record one way or the other, Your Honor. And I would- The district court seemed to dismiss this claim in part because it was based heavily on Mr. Martinez's testimony or affidavit, which he found inadequately corroborated by documentary evidence. But was that correct? Why wasn't Mr. Martinez's own testimony about the state of the compartment adequate to find that there was an excessive amount of grease? I'm not sure that would be the basis that I would rely that decision upon, Your Honor. I think that nonetheless, the record supports the conclusion that there was no defective condition caused by the leaking oil and grease because other evidence in the record in addition to his testimony about his duties, about his successful performance of the inspection and the recycling of the oil and the cleaning of the cabinet. In addition to the photographs of the containment measures, together support the conclusion that he cannot establish his unseaworthiness claim. The record reflects that he had complained about this also to some engineers as well. I was a little unclear who they were and who else he might have complained to and whether the city did anything in response. Does the record answer those questions? It does not. Most critically here, although the record does reflect that he complained to somebody about the leaking oil and grease, it does not- I see in his affidavit, this is A148, he says that the pistons constantly and continuously leaked oil and grease that the paint cans would routinely overflow onto the steering compartment deck. I mean, there does seem to be evidence in the record that there was excessive leaking. Certainly, Your Honor, and arguably that is why the oil- If we can shrew this in his favor. Your Honor, that is arguably why the oilmen were charged with cleaning the cabinet and provided all these supplies when they did so. As to the complaint that he made in response to Judge Carney's question, there is no evidence in the record as to whether he complained before or after these containment measures were put in place. And before or after the oilmen were assigned this duty to be cleaning. He says before my August 12th accident, I had complained to DOT engineers about the- Yes, before his accident. Yes. But we don't know whether or not he complained and then they put the coffer dams and the oil pans there. We don't know if he complained and then- Summary judgment, we have to view it in the light most favorable to him. Yes, but it's the light most favorable, I don't think, permits the court to read into his affidavit a statement of fact that doesn't even exist there. He doesn't say, this was summary judgment, he had an opportunity to introduce evidence here. And he never stated whether he complained that these containment measures were inadequate. That this excessive leaking was not- Wouldn't it have been your obligation to refute that there was a question of fact? To say that, well, after he complained, we took the following additional steps. But there's no evidence that you put forward to that extent either. That's correct, Your Honor. The evidence is the existing containment measures and his ability to successfully perform his job, which I think establishes that there was not unreasonable slipperiness in the container. Again, the unseaworthiness is a relative concept depending on the circumstances in which the fitness is questioned. And here for the oilman- What about the, you only have a- Sure. Minutes left, the ladder. Yeah, the ladder. Sure, Your Honor. It does, looking at the photographs, I think what I'm hearing on the other side makes sense in that you can't go in facing the cover. You have to go down sideways. And it does look like an awkward movement that one has to make to go down. Your Honor, there's no question that it looks like an awkward movement that's required. As Judge Raji pointed out, there's simply no evidence that notwithstanding the awkwardness of this, there was any record of incidents or accidents or complaints about the awkwardness of this requirement. There's also no evidence as to exactly how he was positioned when he fell. Although- Put that separately, the unseaworthiness claim does not require notice. It's simply a question of whether providing such a means for- Certainly, Your Honor. Is unseaworthy. I mean, it seems very curious that the way you have to use a ladder on a ship is sideways. Well, Your Honor, as Your Honor pointed out, the ladder was in compliance at the time it was installed. And although there are more modern and updated safety requirements, they don't supersede the existing safety requirements. So the fact that a safer ladder might be able, safer handholds today, doesn't establish that this is defective. And with no record- Does the ladder specification for what was acceptable include a hatch of that size? Yes, Your Honor. 50 inch hatch? I believe, I don't have a citation for you, but I believe that the hatch and the ladder met the required standards and have not been, there's no evidence that they've been superseded. So as his- I understand if the ladder had been facing the wider part of the hatch. Right. Facing the narrow part of the hatch, was that what specifications- Your Honor, I don't know the answer to that. You want to defend it as seaworthy in that condition? Yes, Your Honor, I believe that because, as the plaintiff's expert said, the next possible handhold was the hatch cover, which was chained to a stanchion. The existence of both the hatch cover and the combing have been recognized in other context as the next available effective means of gaining a handhold. And although the more modern industry standards might provide certainly a more comfortable or more accessible handhold, it doesn't render the existing configuration of this ship a defective and unsafe condition. Notwithstanding the fact that for a large person, it may be an awkward squeeze. As you pointed out, he had successfully managed to navigate this awkwardness for nine years, as had all of his colleagues who had been using this. And there was no record that also when the Coast Guard came and expected the steering compartment, although they don't do an inspection of the ladder, there was no record that the boat had ever been notified by them that this seemed like an unsafe or dangerous condition. So the ladder satisfied those safety requirements had been in use for over 50 years without complaints or accidents. And it offered multiple other handholds. In the OSHA regulations for longshoremen, which aren't governing here but are analogous, it only requires an effective means of gaining a handhold at the top of a ladder. And there was such an effective means here as demonstrated by the history. Thank you very much. Thank you, Your Honor. Dr. Spam, you have reserved two minutes. Briefly, Your Honor, as Judge Chin recognized, the appendix does- You want to just be in the mic? Does talk about excessive oil, I'm sorry, excessive oil in fairly detailed accounts. When you say the appendix, you're talking about Mr. Martinez's affidavit? His affidavit at A148. He does go into detail about the excessive amount and the coating on the deck in this enclosed steering compartment. As far as the Coast Guard inspections, we cited in our brief, the Coast Guard is mainly concerned with passenger safety. Are there enough life vests? They don't inspect every appurtenance on the vessel. And as a matter of fact, in 1989, the Coast Guard came out with additional directives, which are cited in Dr. Fisher's report, that appurtenances should be modified to make it safer. Just because a vessel was built according to whatever specs may have existed back in the early 60s, does not mean that you should not modify it to make it safer for merchant mariners. And in closing, it's not the Coast Guard's function to determine what's seaworthy. It's this court's function to determine what's seaworthy. And going up a ladder sideways against the rungs, with no real place to prevent yourself from falling, in our opinion, is unsafe, dangerous, and directly cause this accident. Thank you. Is there any record evidence, I didn't see in your expert's report, that what was unsafe and unseaworthy about this ladder was that you went up a ladder, and you had to twist sideways to get out of it. Did the expert voice an opinion on that device, handrails or no handrails, that requiring somebody to do that was unsafe? Yes, he did. Where is that, because I may have overlooked it. Well, I know it's in his affidavit, which is. Where is it? At A140, in paragraph five, he talks about extreme bodily contortions while squeezing out of a too small opening. That's the last sentence in paragraph five on A140. Thank you. Okay, thank you judges. We'll take the case under advisement. Thank you both for your arguments. We'll hear